IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 10-663 |
| v. | : | DATE FILED: December 15, 2010 |
| EMMANUEL MOORE,<br>a/k/a/ "Duck,"<br>a/k/a "Shorty,"<br>a/ka/ Hassin Bethea"<br>THEODORE MCFADDEN, SR.<br>MONIQUE PEARSON MOORE,<br>a/k/a "Mo"<br>JAQUEL CREWS,<br>a/k/a "Quelly"<br>VINCENT CREWS,<br>a/k/a "Vinny"<br>MARK MILLER,<br>a/k/a "Sharkey"<br>MELVA PACK | : | VIOLATIONS:<br>21 U.S.C. § 846 (conspiracy to distribute 5 kilograms or more of cocaine - 1 count)<br>21 U.S.C. § 846 (conspiracy to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base ("crack") -1 count)<br>21 U.S.C. § 846 (attempted possession with intent to distribute 500 grams or more of cocaine - 1 count)<br>21 U.S.C. § 841(a)(1) (distribution of 50 grams or more of cocaine base ("crack") - 1 count)<br>21 U.S.C. § 843(b) (unlawful use of a communication facility - 3 counts)<br>18 U.S.C. § 1956(a)(1) (money laundering - 20 counts)<br>18 U.S.C. § 2 (aiding and abetting)<br>Notice of forfeiture |

SECOND SUPERSEDING INDICTMENT

COUNT ONE

THE GRAND JURY CHARGES THAT:

1. From in or about May, 2007, to in or about June, 2008, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendants

EMMANUEL MOORE,
a/k/a "Duck,"
a/k/a "Shorty,"
a/k/a "Hassin Bethea,"
THEODORE McFADDEN, SR., and
MONIQUE PEARSON MOORE,
a/k/a "Mo,"

conspired and agreed, together and with others known and unknown to the grand jury, to knowingly and intentionally distribute 5 kilograms or more, that is, approximately 8 kilograms, of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A).

**MANNER AND MEANS**

It was part of the conspiracy that:

2. Defendant EMMANUEL MOORE organized and directed others known and unknown to the grand jury, including his father, defendant THEODORE MCFADDEN, SR., and his wife, MONIQUE PEARSON MOORE, in a drug trafficking business by using those individuals to assist him in the purchase of multi-kilogram quantities of cocaine from sources of supply in California, for distribution and sale in Philadelphia, Pennsylvania and elsewhere.

3. At defendant EMMANUEL MOORE's direction, defendant THEODORE MCFADDEN, SR. traveled from Philadelphia, Pennsylvania to Los Angeles, California to purchase multi-kilogram quantities of cocaine.

4. Defendant MONIQUE PEARSON MOORE assisted defendant EMMANUEL MOORE in his drug trafficking business, by providing cellular telephones for his use in coordinating drug trafficking activities, making travel arrangements for his trips to California to purchase cocaine, packaging large sums of money for the purchase of cocaine by defendant MCFADDEN from a California source of supply (the "CSOS"), and assisting with the tracking of a package of cocaine shipped by the CSOS to an address in the Philadelphia, Pennsylvania area provided to the CSOS by defendant EMMANUEL MOORE.

5. Defendants EMMANUEL MOORE, THEODORE MCFADDEN, SR., and MONIQUE PEARSON MOORE, and others known and unknown to the grand jury, used cellular telephones to coordinate their drug trafficking activities.

**OVERT ACTS**

In furtherance of the conspiracy and to accomplish its object, defendants EMMANUEL MOORE, THEODORE MCFADDEN, SR., and MONIQUE PEARSON MOORE, and others known and unknown to the grand jury, committed the following overt acts, among others, in the Eastern District of Pennsylvania, the Southern District of California, and elsewhere:

1. On or about May 31, 2007, at the direction of defendant EMMANUEL MOORE, defendant MONIQUE PEARSON MOORE provided Person # 1 known to the grand jury (Person # 1) with a cellular telephone so that defendant EMMANUEL MOORE could communicate with Person # 1 about defendant EMMANUEL MOORE's drug trafficking activities.

2. On or about June 2, 2007, defendant MONIQUE PEARSON MOORE made arrangements for defendant THEODORE MCFADDEN, SR. to fly from Philadelphia, Pennsylvania to Los Angeles, California to purchase cocaine from the CSOS and packed approximately $34,000 in the luggage of defendant MCFADDEN to be paid to the CSOS .

On or about June 4, 2007:

3. At the direction of defendant EMMANUEL MOORE, defendant THEODORE MCFADDEN, SR. flew from Philadelphia, Pennsylvania to Los Angeles with approximately $34,000 packed in his luggage.

4. At the direction of defendant EMMANUEL MOORE, defendant

THEODORE MCFADDEN, SR. met with the CSOS in Los Angeles, California and paid the CSOS approximately $34,000 for the cocaine.

5. Defendant THEODORE MCFADDEN, SR. accompanied the CSOS to a United Parcel Service ("UPS") shipping store where the CSOS tendered a package containing approximately 3 kilograms of cocaine ("the June 4th package") to UPS for delivery to an address in the Philadelphia, Pennsylvania area that had been provided by defendant EMMANUEL MOORE.

On or about June 5, 2007:

6. Defendants EMMANUEL MOORE and THEODORE MCFADDEN, SR., and Person # 1 spoke, via cellular telephone, about tracking the June 4th package.

7. Defendants EMMANUEL MOORE and MONIQUE PEARSON MOORE, and Person # 1 spoke, via cellular telephone, about tracking the June 4th package.

8. On or about June 6, 2007, defendant THEODORE MCFADDEN, SR. and Person # 1 spoke, via cellular telephone, about the June 4th package.

9. On or about June 9, 2007, defendant MONIQUE PEARSON MOORE and individuals known to the grand jury spoke, via cellular telephone, about the June 4th package and discussed her past drug trafficking activities and the drug trafficking activities of defendant EMMANUEL MOORE.

On or about May 27, 2008:

10. Defendants EMMANUEL MOORE and THEODORE MCFADDEN, SR. flew from Philadelphia, Pennsylvania to Los Angeles, California to purchase multi-kilogram quantities of cocaine.

11. In a Hilton Hotel in Los Angeles, California ("the Hilton Hotel"),

defendant EMMANUEL MOORE:

(a) possessed for distribution and controlled a black duffle bag containing approximately 5 kilograms of cocaine ("the black duffle bag"), which he gave to defendant THEODORE MCFADDEN, SR; and

(b) possessed and controlled a white plastic shopping bag containing a food saver heat sealing vacuum, food saver vacuum storage bags and plastic wrap, all of which are used to package drugs.

13. Defendant THEODORE MCFADDEN, SR. transported the black duffle bag from the Hilton Hotel to a W Hotel in the Beverly Hills section of Los Angeles, California ("the W Hotel").

14. At the W Hotel, defendant THEODORE MCFADDEN, SR. possessed and controlled the black duffle bag and a black suitcase containing approximately $100,000.

All in violation of Title 21, United States Code, Section 846.

**COUNT TWO**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 5, and Overt Acts 1 through 5 of Count One of this superseding indictment are incorporated here.

2. On or about June 4, 2007, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

**EMMANUEL MOORE,**
**a/k/a "Duck,"**
**a/k/a "Shorty,"**
**a/k/a "Hassin Bethea,"**
**THEODORE McFADDEN, SR., and**
**MONIQUE PEARSON MOORE,**
**a/k/a "Mo,"**

knowingly and intentionally attempted to possess with intent to distribute, and aided and abetted the attempted possession with intent to distribute of, 500 grams or more, that is, approximately 3 kilograms, of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(B).

In violation of Title 21, United States Code, Section 846.

**COUNT THREE**

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about June 5, 2007, in the Eastern District of Pennsylvania and elsewhere, defendants

**EMMANUEL MOORE,**
**a/k/a "Duck,"**
**a/k/a "Shorty,"**
**a/k/a "Hassin Bethea," and**
**THEODORE MCFADDEN, SR.,**

knowingly and intentionally used a communication facility, that is, a telephone, in committing and in causing and facilitating a felony, that is, the attempted possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846, in that they discussed the shipping and tracking of the package containing approximately 3 kilograms shipped on June 4, 2007.

In violation of Title 21, United States Code, Section 843(b).

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about June 5, 2007, in the Eastern District of Pennsylvania, defendants

**EMMANUEL MOORE,**
**a/k/a "Duck,"**
**a/k/a "Shorty,"**
**a/k/a "Hassin Bethea," and**
**MONIQUE PEARSON MOORE,**
**a/k/a "Mo,"**

knowingly and intentionally used a communication facility, that is, a telephone, in committing and in causing and facilitating a felony, that is, the attempted possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846, in that they discussed the tracking of the package containing approximately 3 kilograms shipped on June 4, 2007 and payment for the cocaine in that package.

In violation of Title 21, United States Code, Section 843(b).

## COUNT FIVE

**THE GRAND JURY CHARGES THAT:**

1. From in or about 1986 to on or about November 16, 2007, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**EMMANUEL MOORE,**
**a/k/a "Duck,"**
**THEODORE McFADDEN, SR.,**
**MONIQUE PEARSON MOORE,**
**a/k/a "Mo,"**
**JAQUEL CREWS,**
**a/k/a "Quelly,"**
**VINCENT CREWS,**
**a/k/a "Vinny," and**
**MARK MILLER,**
**a/k/a "Sharkey"**

conspired and agreed, together and with others known and unknown to the grand jury, to knowingly and intentionally distribute 5 kilograms or more, that is, hundreds of kilograms, of a mixture and substance containing a detectable amount of cocaine, and 50 grams or more, that is multiple kilograms, of a mixture and substance containing a detectable amount of cocaine base ("crack"), each a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A).

## MANNER AND MEANS

It was part of the conspiracy that:

### The Frankford Drug Trafficking Associates

2. The Frankford Drug Trafficking Associates (hereinafter "Frankford DTA"), comprised of defendants EMMANUEL MOORE, JAQUEL CREWS, VINCENT CREWS, and MARK MILLER, and Craig Lofton, charged elsewhere, and others known and

unknown to the grand jury, formed and maintained a multi-million dollar cocaine and crack cocaine distribution association based in the Frankford section of Philadelphia, Pennsylvania. The Frankford DTA trafficked hundreds of kilograms of cocaine and crack cocaine in Frankford and other areas of Philadelphia.

3. Defendants EMMANUEL MOORE, JAQUEL CREWS, VINCENT CREWS, and MARK MILLER pooled money with each other, and with others known and unknown to the grand jury, to purchase multi-kilogram quantities of cocaine, received delivery of kilogram quantities of cocaine, packaged cocaine for sale, sold kilogram quantities of cocaine, cooked and packaged crack cocaine for sale, and used others known and unknown to the grand jury to sell cocaine and crack cocaine.

4. Defendants EMMANUEL MOORE, JAQUEL CREWS and MARK MILLER delivered cash to a California-based cocaine supplier, Timothy Carter, a/k/a "Scooby," charged elsewhere, by transporting cash on airline flights from Philadelphia to Los Angeles, California and Las Vegas, Nevada.

5. Defendant EMMANUEL MOORE, through defendant MONIQUE PEARSON MOORE, delivered cash to Carter as payment for kilogram quantities of cocaine in Philadelphia, Pennsylvania when Carter flew from California to Philadelphia.

6. Carter shipped kilogram quantities of cocaine to the Frankford DTA members via delivery services at addresses provided by members of the Frankford DTA.

7. The Frankford DTA members worked together to assure that their unlawful drug trafficking activities remained undiscovered by law enforcement authorities. For example, the Frankford DTA members used cellular telephones to communicate with each other and others concerning their drug trafficking activities, changed cellular telephone numbers frequently, and stored, packaged and cooked their cocaine at addresses other than their personal residences.

8. Because Frankford DTA drug trafficking activities generated millions of dollars in gross receipts and profits, some Frankford DTA members laundered the proceeds of the drug trafficking activities through the purchase of real estate, luxury automobiles and other luxury goods, such as jewelry, furs, audio equipment and luggage.

9. Frankford DTA members protected and promoted the continued viability of the conspiracy by, among other things: (a) retaining lawyers for criminally charged individuals who worked with Frankford DTA members; and (b) paying legal fees for criminally charged individuals who worked with Frankford DTA members.

10. Frankford DTA members used violence and threats to further the goals of the conspiracy.

11. Frankford DTA members used various properties belonging to them and others as "stash houses" to store and package cocaine and crack cocaine.

12. Defendant MONIQUE PEARSON MOORE assisted defendant EMMANUEL MOORE by holding money and cocaine, making payments for cocaine, and making arrangements for the purchase and sale of cocaine and crack cocaine.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, the defendants, and others known and unknown to the grand jury, committed the following overt acts, among others in the Eastern District of Pennsylvania and elsewhere:

**Dealings of Frankford DTA Members with M.T.**

1. Throughout 2004, defendant VINCENT CREWS supplied M.T., a person known to the grand jury, on approximately six or seven occasions with approximately 126 grams of cocaine each time, with the cocaine for each purchase delivered on consignment to M.T. by defendant VINCENT CREWS or defendant JAQUEL CREWS, and with payment for each cocaine purchase made at a later time by M.T. to defendant VINCENT CREWS or defendant JAQUEL CREWS.

2. In the summer of 2004, on one occasion, defendant JAQUEL CREWS, in the presence of defendant VINCENT CREWS, provided M.T. with cocaine at a location on Orthodox Street in Philadelphia, Pennsylvania after defendant VINCENT CREWS had failed to deliver cocaine for which defendant VINCENT CREWS had already been paid by M.T.

3. Throughout 2004, M.T. purchased cocaine from defendant MARK MILLER.

4. On or about September 22, 2005, M.T. arranged for the purchase of four and one-half ounces of cocaine from defendant MARK MILLER.

**Dealings of Frankford DTA Members with Vincent Graham**

5. Throughout 1995, defendant VINCENT CREWS supplied Vincent Graham, charged elsewhere, with crack cocaine on a regular basis, which Graham repackaged and sold in the Frankford section of Philadelphia, Pennsylvania.

6. On or about December 14, 1995, Vincent Graham possessed crack cocaine that had been supplied to him by defendant VINCENT CREWS.

7. On or about July 8, 1996, Vincent Graham possessed crack cocaine that had been supplied to him by defendant VINCENT CREWS.

8. From in or about November 1998 through in or about March 1999, Vincent Graham purchased four and one-half ounce quantities of crack cocaine from defendant VINCENT CREWS on a regular basis.

9. From in or about April 2001 through in or about December 2001, Vincent Graham purchased ounce to four and one-half ounce quantities of cocaine from defendants VINCENT CREWS and JAQUEL CREWS on a regular basis.

10. Throughout 2003, Vincent Graham purchased 15 to 16 ounce quantities of cocaine from defendants VINCENT CREWS and JAQUEL CREWS on a regular basis.

11. Throughout 2005, defendant JAQUEL CREWS supplied Vincent Graham with four and one-half ounce to 13 ounce quantities of cocaine on consignment on a weekly basis.

12. From in or about January 2006 to in or about May 2006, defendant JAQUEL CREWS supplied Vincent Graham with four and one-half ounce to 13 ounce quantities of cocaine on consignment on a weekly basis.

13. On or about June 3, 2006, defendant JAQUEL CREWS supplied Vincent Graham with four and one-half ounces of cocaine on consignment.

**Dealings of Frankford DTA Members with Terrell Boyd**

14. From in or about February 2003 to in or about April 2003, defendant VINCENT CREWS supplied Terrell Boyd, charged elsewhere, with four and one-half ounce quantities of crack cocaine on consignment two or three times per week, with the cocaine for each purchase delivered to Boyd by defendant VINCENT CREWS or defendant JAQUEL CREWS and with payment for each cocaine purchase made at a later time by Boyd to defendant VINCENT CREWS or defendant JAQUEL CREWS

**Dealings of Frankford DTA Members with Michael Crosby**

15. In or about November 2003, Michael Crosby, charged elsewhere, observed Craig Lofton packaging for sale 3 kilograms of cocaine that Lofton had received from defendant EMMANUEL MOORE on consignment

16. In or about November 2004, defendant JAQUEL CREWS accompanied Craig Lofton to pay a retainer of approximately $30,000 for an attorney for Michael Crosby after Crosby was charged with possession with intent to distribute cocaine, cocaine that Crosby was in the process of delivering to a customer for Lofton on or about January 4, 2004.

**Dealings of Frankford DTA Members with T.M.**

17. Throughout 2003, on occasions when Frankford DTA member Craig Lofton did not have cocaine available for sale, defendants JAQUEL CREWS and VINCENT CREWS supplied T.M., a person known to the grand jury, with multi-kilogram quantities of cocaine.

18. On or about October 24, 2004, T.M. pooled money with Frankford DTA members, including Craig Lofton and defendants EMMANUEL MOORE, JAQUEL CREWS and VINCENT CREWS, for the purchase of cocaine from a California supplier.

19. On or about August 27, 2005, defendant JAQUEL CREWS supplied T.M. with 500 grams of cocaine on consignment.

**Dealings of Frankford DTA Members with D.F.**

20. Throughout 2003, defendants JAQUEL CREWS and VINCENT CREWS used the Philadelphia, Pennsylvania residence of D.F., a person known to the grand jury, to package cocaine and to cook and package crack cocaine.

21. On or about September 6, 2003, using approximately $31,780 in cash from defendant VINCENT CREWS' drug proceeds as a down payment, D.F., at the request of defendant VINCENT CREWS, purchased in D.F.'s name a 2002 BMW 745 LI Sedan for approximately $70,432 from Courtesy Chrysler Jeep in Thorndale, Pennsylvania.

22. Throughout 2004, defendant JAQUEL CREWS used D.F.'s residence in Philadelphia, Pennsylvania to package multi-kilogram quantities of cocaine and to cook and package crack cocaine.

23. Throughout 2006, defendants JAQUEL CREWS and MARK MILLER used D.F.'s residence in Philadelphia, Pennsylvania to divide multi-kilogram quantities of cocaine between them, to package cocaine, and to cook and package crack cocaine.

24. In or about March 2007, defendant JAQUEL CREWS advised D.F. not to speak to federal authorities about involvement with the drug trafficking activities of Frankford DTA members, stating that D.F. could spend a year in prison rather than cooperate with federal law enforcement authorities.

**Dealings of Frankford DTA Members with James Miller**

25. Throughout 2003, defendant VINCENT CREWS supplied four and one-half ounce quantities of cocaine to James Miller, a/k/a "Omar," charged elsewhere, approximately two times per week.

26. Throughout 2004, defendant JAQUEL CREWS supplied four and one-half or 9 ounce quantities of cocaine to James Miller approximately two times per week.

27. Throughout 2005, defendant JAQUEL CREWS supplied kilogram quantities of cocaine to James Miller approximately two times per week.

28. In or about 2006, on one occasion, defendants JAQUEL CREWS and MARK MILLER pooled $40,000 and purchased 2 kilograms of cocaine from James Miller outside James Miller's apartment in Philadelphia, Pennsylvania.

29. In or about early 2006, defendant JAQUEL CREWS made a partial payment of approximately $125,000 to James Miller for the purchase of approximately 10 to 15 kilograms of cocaine.

30. On or about October 5, 2006, at the direction of James Miller, J.M., a person known to the grand jury, delivered approximately $100,000 to defendant JAQUEL CREWS as payment for multi-kilogram quantities of cocaine.

**Dealings of Frankford DTA Members with M.D.**

31. In or about September 2005, defendant MARK MILLER made a partial payment in the amount of approximately $5,000 to M.D., a person known to the grand jury, for the purchase of approximately 2 to 3 kilograms of cocaine.

**Dealings of Frankford DTA Members with Eric McCoy**

32. In or about April 2005, defendant JAQUEL CREWS supplied Eric McCoy, a/k/a "Booper," charged elsewhere, with 2 ounces of crack cocaine on consignment.

33. From in or about May 2005 to in or about June 2006, defendant JAQUEL CREWS supplied Eric McCoy with four and one-half ounce quantities of crack cocaine on consignment approximately two times per month.

34. On or about June 29, 2006, McCoy possessed one ounce of crack cocaine, which had been supplied to him by defendant JAQUEL CREWS.

**Internal Dealings of Frankford DTA Defendants**

35. In or about September 2001, defendant MARK MILLER stored approximately one pound of crack cocaine in the closet of a property on the 1800 block of Harrison Street in the Frankford section of Philadelphia, which was owned by defendant MARK MILLER and on which defendant MARK MILLER was doing construction work.

36. Throughout 2002, defendants JAQUEL CREWS and MARK MILLER cooked cocaine into crack cocaine at 1684 Margaret Street, a property owned by defendant JAQUEL CREWS, in the Frankford section of Philadelphia, Pennsylvania.

37. In or about November 2003, Craig Lofton, defendant EMMANUEL MOORE and E.D., a person known to the grand jury, carrying large sums of currency concealed in their luggage, flew to California to arrange and make payment for the purchase of multi-kilogram quantities of cocaine.

38. In or about November 2003, Craig Lofton received 3 kilograms of cocaine from defendant EMMANUEL MOORE which Lofton then stored and packaged at a residence on Glendale Street in Philadelphia, Pennsylvania.

39. On or about October 24, 2004, defendant EMMANUEL MOORE went to the Philadelphia International Airport to take a flight to Los Angeles, California, carrying approximately $344,314 in currency concealed in his luggage. That currency, money that had been pooled by defendants EMMANUEL MOORE, JAQUEL CREWS and VINCENT CREWS and others known and unknown to the grand jury for the purchase of multi-kilogram quantities of cocaine, was seized by law enforcement authorities from defendant MOORE at the Philadelphia International Airport.

40. On or about June 7, 2005, defendant JAQUEL CREWS, Craig Lofton and K.I., a person known to the grand jury, carrying large sums of currency concealed in their luggage, flew to Los Angeles, California to arrange and make payment for the purchase of multi-kilogram quantities of cocaine from Timothy Carter.

41. On or about July 28, 2005, in a hospital room in Thomas Jefferson University Hospital in Philadelphia, Pennsylvania, in the presence of Craig Lofton, defendant JAQUEL CREWS sold approximately 2 to 3 kilograms of cocaine to James Miller.

42. On or about August 4, 2005, at his apartment in Philadelphia, Pennsylvania, Craig Lofton delivered money to Timothy Carter for the purchase of multi-kilogram quantities of cocaine by Lofton and defendant JAQUEL CREWS.

43. On or about August 10, 2005, at the direction of Craig Lofton and defendant JAQUEL CREWS, Timothy Carter sent a package containing 4 kilograms of cocaine intended for defendant JAQUEL CREWS and Lofton to 11819 Academy Road, Unit 19B, Philadelphia, Pennsylvania, an apartment rented by R.T., a person known to the grand jury, who is the nephew of defendant JAQUEL CREWS and the brother of defendant VINCENT CREWS.

44. On or about August 18, 2005, at the direction of Craig Lofton and

defendant MARK MILLER, Timothy Carter sent a package containing 4 kilograms of cocaine intended for Lofton to 4257 Griscom Street, Philadelphia, Pennsylvania, and sent a package containing 2 kilograms of cocaine intended for defendant MILLER to 1835 Harrison Street, Philadelphia, Pennsylvania.

45. On or about December 8, 2005, defendant MARK MILLER and Craig Lofton, carrying large sums of currency concealed in their luggage, flew to Las Vegas, Nevada to arrange and make payment for the purchase of multi-kilogram quantities of cocaine from Timothy Carter.

46. On or about January 15, 2006, defendant EMMANUEL MOORE, T.M., and Craig Lofton, carrying large sums of currency concealed in their luggage, flew to Las Vegas, Nevada to arrange and make payment for the purchase of multi-kilogram quantities of cocaine from Timothy Carter.

47. On or about January 18, 2006, at the direction of defendant EMMANUEL MOORE, T.M. and Craig Lofton:

a. Timothy Carter sent a package containing 2 kilograms of cocaine intended for defendant EMMANUEL MOORE and T.M. to 7168 Ruskin Lane, Upper Darby, Pennsylvania; and

b. Timothy Carter sent a package containing 2 kilograms of cocaine intended for Craig Lofton to 5758 Colgate Street, Philadelphia, Pennsylvania.

48. In or about February 2006, at his home in Sicklerville, New Jersey, defendant JAQUEL CREWS gave Craig Lofton approximately $60,000 in currency for the purchase of cocaine, which Lofton and others known to the grand jury took, along with other money, concealed in luggage, to California as payment for the purchase of multi-kilogram quantities of cocaine from Timothy Carter.

49. On or about April 10, 2006, at his home in Sicklerville, New Jersey, defendant JAQUEL CREWS gave Craig Lofton approximately $70,000 in currency for Lofton to deliver to Timothy Carter for the purchase of multi-kilogram quantities of cocaine.

50. During the summer of 2006, Craig Lofton purchased multi-kilograms of cocaine from a supplier in North Carolina, unknown to the grand jury, and then distributed kilogram quantities of cocaine to defendants JAQUEL CREWS, MARK MILLER and VINCENT CREWS.

51. On or about August 13, 2006, Timothy Carter flew to Philadelphia, Pennsylvania and met with defendants EMMANUEL MOORE and MONIQUE PEARSON MOORE and Craig Lofton to arrange for payment for, and delivery of, multi-kilogram quantities of cocaine.

52. On or about the following dates, Timothy Carter met with defendants EMMANUEL MOORE and MONIQUE PEARSON MOORE and others in Philadelphia, Pennsylvania to arrange for payment for, and delivery of, multi-kilogram quantities of cocaine:

a. October 17, 2006;

b. November 28, 2006;

c. December 8, 2006;

d. January 29, 2007;

e. February 7, 2007;

f. February 25, 2007; and

g. April 16, 2007.

53. On or about May 31, 2007, defendant THEODORE MCFADDEN, SR., at the direction of defendant EMMANUEL MOORE and with the assistance of defendant MONIQUE PEARSON MOORE, flew to Los Angeles, California, carrying a large amount of currency concealed in his luggage, and met with Timothy Carter to make arrangements for the shipment of a kilogram of cocaine.

54. On or about May 31, 2007, Timothy Carter, at the direction of defendant EMMANUEL MOORE, shipped a package containing 1 kilogram of cocaine, which was intended for defendant MOORE, to 7021 Guilford Road, Upper Darby, Pennsylvania, where, at the direction of defendant MOORE, it was picked up by defendant THEODORE MCFADDEN, SR. and others unknown to the grand jury.

55. From on or about November 14, 2007, to on or about November 16, 2007, Timothy Carter met with defendants EMMANUEL MOORE, THEODORE MCFADDEN, SR. and MONIQUE PEARSON MOORE, and others known to the grand jury, in Philadelphia, Pennsylvania to arrange for the sale of multi-kilogram quantities of cocaine.

All in violation of Title 21, United States Code, Section 846.

**COUNT SIX**

**THE GRAND JURY CHARGES THAT:**

On or about January 15, 2009, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**MONIQUE PEARSON MOORE,**
**a/k/a "Mo," and**
**MELVA PACK**

knowingly and intentionally distributed, and aided and abetted the distribution of, 50 grams or more, that is, approximately 108 grams, of a mixture and substance containing a detectable amount of cocaine base ("crack"), a Schedule II controlled substance.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A) and Title 21, United States Code, Section 2.

**COUNT SEVEN**

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about January 15, 2009, in the Eastern District of Pennsylvania, defendants

**MONIQUE PEARSON MOORE,**
**a/k/a "Mo," and**
**MELVA PACK**

knowingly and intentionally used a communication facility, that is, a telephone, in committing and in causing and facilitating a felony, that is, the distribution 50 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A), in that they discussed the distribution of approximately 108 grams of crack cocaine to T.M., a person known to the grand jury.

In violation of Title 21, United States Code, Section 843(b).

## COUNTS EIGHT THROUGH TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about March 24, 1995, defendant JAQUEL CREWS used the proceeds from his drug trafficking activities to purchase the premises located at 1684 Margaret Street, Philadelphia, Pennsylvania (the 1684 Margaret Property).

3. From about March 29, 1996 to about April 26, 2000, defendant JAQUEL CREWS was unemployed.

4. On or about September 8, 2000, defendant JAQUEL CREWS applied for a mortgage loan on the 1684 Margaret Property. In his mortgage application, defendant JAQUEL CREWS falsely claimed that he had been employed as manager of Dina and Diras Unisex Salon for the prior 6 years. Defendant JAQUEL CREWS submitted false W-2s for the years 1998 and 1999 purporting to show wages from Dina and Diras Unisex Salon for those years. He likewise falsely claimed to have lived at a rental address on Foulkrod Street in Philadelphia for the prior four years.

5. As a result of this false mortgage application, defendant JAQUEL CREWS obtained a check for $23,798.38, which he deposited into his M&T bank account. Also as a result of this false mortgage application, the CIT Group acquired a mortgage on the 1684 Margaret Property. The CIT Group then transferred this mortgage, which was acquired by HSBC Bank USA, FDIC Certificate 57890, in 2003, and was serviced by America's Servicing Company.

6. In or about the spring of 2006, in order to conceal his prior mortgage fraud

and to further promote and conceal his drug trafficking activities, defendant JAQUEL CREWS sought to obtain a new loan on the 1684 Margaret Property.

7. In this mortgage loan application, defendant JAQUEL CREWS falsely claimed to be employed at Credit Rebuilders of Philadelphia, and falsely claimed that he had been so employed for the prior five years.

8. In order to conceal that his income was obtained primarily from drug trafficking, defendant JAQUEL CREWS further falsely claimed that he earned more than $7000 per month as an employee of Credit Rebuilders. As part of this concealment, defendant JAQUEL CREWS caused a false W-2 and false earnings statements to be submitted as part of his loan application.

9. On or about April 17, 2006, through the false and fraudulent statements on defendant JAQUEL CREWS' loan application, defendant JAQUEL CREWS caused Argent Mortgage Company LLC to make a loan of $72,000.00 against the 1684 Margaret Property. The loan was funded by a wire of $71,173.45 to the closing agency, Fidelity National Title. As part of this loan, Fidelity National Title paid approximately $26,046.62 to America's Servicing Company to obtain a release of the HSBC Bank USA loan, paid water and sewer bills to the City of Philadelphia of $650.00, and disbursed $38,715.75 to defendant JAQUEL CREWS.

10. On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAQUEL CREWS**

knowingly conducted, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 8 | 4/17/2006 | wire transfer of $71,173.45 to Fidelity National Title |
| 9 | 4/17/2006 | payment of $26,046.62 to America's Servicing Company |
| 10 | 4/17/2006 | cashing of $38,715.75 check for loan proceeds |

11. When conducting and willfully causing the financial transactions described in paragraph 10, above, defendant JAQUEL CREWS knew that the property involved in those financial transactions represented the proceeds of some form of unlawful activity.

12. The financial transactions described in paragraph 10, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant JAQUEL CREWS acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

## COUNTS ELEVEN THROUGH FOURTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about April 18, 2001, defendant JAQUEL CREWS used the proceeds from his drug trafficking activities to purchase the premises located at 1829 Fillmore Street, Philadelphia, Pennsylvania (the 1829 Fillmore Property).

3. In or about February 2003, defendant JAQUEL CREWS applied for a mortgage loan on the 1829 Fillmore Property (the February 2003 Loan). In his mortgage application, defendant CREWS falsely claimed that he had been employed as manager of the "How You Want it" Barbershop for the prior 5 years. He falsely claimed in a letter to the lender dated February 19, 2003, that the purpose of the loan was to obtain capital to become a partner in that barbershop business. In connection with this application, defendant JAQUEL CREWS submitted false W-2s for the years 2001 and 2002 purporting to show wages from the barbershop for those years. He falsely claimed that he owned the property where he was living on Foulkrod Street in Philadelphia.

4. As a result of this false mortgage application, defendant JAQUEL CREWS received a loan for $39,900. From the loan funds, on or about Friday, February 28, 2003, defendant JAQUEL CREWS received two checks, one for $20,416.44, and the other for $16,000.00. Instead of using the funds to purchase an interest in the "How You Wannit Barbershop," as he claimed less than two weeks earlier, defendant JAQUEL CREWS used the funds to purchase two properties: 1827 Fillmore Street, Philadelphia, Pennsylvania (the 1827

Fillmore Property), and 4847 Mulberry Street, Philadelphia, Pennsylvania.

5. In or about the spring of 2006, in order to conceal his prior mortgage fraud and to further promote and conceal his drug trafficking activities, defendant JAQUEL CREWS sought to obtain a new loan on the 1827 Fillmore Property (the March 2006 Loan).

6. In this mortgage loan application, defendant JAQUEL CREWS falsely claimed to be employed at Credit Rebuilders of Philadelphia, and falsely claimed that he had been so employed for the prior five years.

7. In order to conceal that his income was obtained primarily from drug trafficking, defendant JAQUEL CREWS further falsely claimed that he earned $6,250.00 per month as an employee of Credit Rebuilders. As part of this concealment, defendant JAQUEL CREWS caused a false W-2 and false earnings statements to be submitted as part of his loan application.

8. On or about March 22, 2006, through the false and fraudulent statements on defendant JAQUEL CREWS' loan application, defendant JAQUEL CREWS caused Argent Mortgage Company LLC to make a loan of $72,000.00 against the 1827 Fillmore Property. The loan was funded by a wire of $71,686.66 to the closing agency, Fidelity National Title. As part of this loan, Fidelity National Title disbursed $59,746.70 to defendant JAQUEL CREWS.

9. On or about April 14, 2006, defendant JAQUEL CREWS used the funds which he had received from the loan against the 1827 Fillmore Property to purchase property at 4635 Dittman Street, Philadelphia, Pennsylvania (the 4635 Dittman Property).

10. On or about December 28, 2006, defendant JAQUEL CREWS applied for a mortgage loan from Chase Bank USA, N.A., FDIC certificate 23702, using the 4635 Dittman

Property as collateral (the December 2006 Loan).

11. In his application for the loan, defendant JAQUEL CREWS falsely claimed to be employed by Credit Rebuilders in order to conceal and disguise the nature and source of CREWS' drug trafficking income.

12. On or about December 28, 2006, through the false and fraudulent statements on defendant JAQUEL CREWS' loan application, defendant JAQUEL CREWS caused Chase Bank USA, N.A. to grant a mortgage loan of $78,400.00 against the 4635 Dittman Property. The net proceeds from the loan of $71,997.88 were disbursed to defendant JAQUEL CREWS on or about December 29, 2006, through a check drawn on the title company's account. Defendant JAQUEL CREWS cashed this check on or about January 8, 2007, depositing $62,497.88 into his Commerce Bank account, and receiving $9.500.00 in cash.

13. On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAQUEL CREWS**

knowingly conducted, and willfully caused, the following financial transactions affecting interstate commerce:

| **COUNT** | **DATE** | **DESCRIPTION** |
|---|---|---|
| 11 | 3/22/2006 | wire transfer of $71,686.66 to Fidelity National Title |
| 12 | 3/28/2006 | check to defendant JAQUEL CREWS of $59,746.40 |
| 13 | 3/30/2006 | deposit of $59,746.70 into defendant JAQUEL CREWS' PFCU bank account |
| 14 | 1/8/2007 | cashing of check for $71,997.88 |

14. When conducting and willfully causing the financial transactions described in paragraph 13, above, defendant JAQUEL CREWS knew that the property involved

in those financial transactions represented the proceeds of some form of unlawful activity.

15. The financial transactions described in paragraph 13, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant JAQUEL CREWS acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

## COUNT FIFTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about February 22, 2002, defendant JAQUEL CREWS used the proceeds from his drug trafficking activities to purchase the premises located at 4834 Tackawanna Street, Philadelphia, Pennsylvania, (the 4834 Tackawanna Property).

3. On or about October 14, 2006, in order to promote and conceal his drug trafficking activities, defendant JAQUEL CREWS applied for a mortgage loan on the 4834 Tackawanna Property. In his mortgage application, defendant JAQUEL CREWS falsely claimed to be employed at Credit Rebuilders of Philadelphia, and falsely claimed that he had been so employed for the prior five years.

4. In order to conceal that his income was obtained primarily from trafficking in drugs, defendant JAQUEL CREWS further falsely claimed that he earned $7,100 per month as an employee of Credit Rebuilders. As part of this concealment, defendant JAQUEL CREWS caused false earnings statements to be submitted as part of his loan application.

5. On or about November 17, 2006, through the false and fraudulent statements on defendant JAQUEL CREWS' loan application, defendant JAQUEL CREWS caused Argent Mortgage Company LLC to make a loan of $60,300 against the 4834 Tackawanna Property. The loan was funded by a wire to the closing agency, First Option Title Agency, LLC (First Option Title). After paying other parties associated with the loan, First Option Title

disbursed $24,469.36 to defendant JAQUEL CREWS. On or about December 2, 2006, defendant JAQUEL CREWS deposited this check into his bank account at Citizens Bank.

6. On or about the date set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAQUEL CREWS**

knowingly conducted, and willfully caused, the following financial transaction affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 15 | 12/2/2006 | deposit of $24,469.36 into JAQUEL CREWS' Citizens' bank account |

7. When conducting and willfully causing the financial transaction described in paragraph 6, above, defendant JAQUEL CREWS knew that the property involved in that financial transaction represented the proceeds of some form of unlawful activity.

8. The financial transaction described in paragraph 6, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant JAQUEL CREWS acted with the knowledge that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

## COUNTS SIXTEEN THROUGH EIGHTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about December 2, 2004, defendant JAQUEL CREWS used the proceeds from his drug trafficking activities to purchase the premises located at 4906 Cottage Street, Philadelphia, Pennsylvania, (the 4906 Cottage Property).

3. On or about November 28, 2006, in order to promote and conceal his drug trafficking activities, defendant JAQUEL CREWS applied for a mortgage loan on the 4906 Cottage Property. In his mortgage application, defendant JAQUEL CREWS falsely claimed to be employed at Credit Rebuilders of Philadelphia, and falsely claimed that he had been so employed for the prior five years.

4. In order to conceal that his income was obtained primarily from trafficking in drugs, defendant JAQUEL CREWS further falsely claimed that he earned $7,200 per month as an employee of Credit Rebuilders.

5. On or about November 28, 2006, through the false and fraudulent statements on defendant JAQUEL CREWS' loan application, defendant JAQUEL CREWS caused FGC Commercial Mortgage Financial, d/b/a Fremont Investment and Loan, to make a loan of $56,000 against the 4906 Cottage Property. The loan was funded by a wire of $54,881.86 to the closing agency, First Option Title. As part of this loan, First Option Title disbursed $49,876.76 to defendant JAQUEL CREWS.

6. On or about the dates set forth below, in Philadelphia, in the Eastern

District of Pennsylvania, and elsewhere, defendant

**JAQUEL CREWS**

knowingly conducted, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 16 | 11/28/2006 | wire transfer of $54,881.86 to First Option Title |
| 17 | 11/29/2006 | check to defendant JAQUEL CREWS of $49,876.76 |
| 18 | 11/30/2006 | deposit of $49,876.76 into JAQUEL CREWS' Commerce bank account |

7. When conducting and willfully causing the financial transactions described in paragraph 6, above, defendant JAQUEL CREWS knew that the property involved in those financial transactions represented the proceeds of some form of unlawful activity.

8. The financial transactions described in paragraph 6, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant JAQUEL CREWS acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

**COUNTS NINETEEN THROUGH TWENTY**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about December 21, 2005, defendant JAQUEL CREWS used the proceeds from his drug trafficking activities to purchase the premises located at 1634 Foulkrod Street, Philadelphia, Pennsylvania, (the 1634 Foulkrod Property) for $11,427.40.

3. In or about November 2006, in order to promote and conceal his drug trafficking activities, defendant JAQUEL CREWS applied for a mortgage loan on the 1634 Foulkrod Property. In his mortgage application, defendant JAQUEL CREWS falsely claimed to be employed at Credit Rebuilders of Philadelphia, and falsely claimed that he had been so employed for the prior five years.

4. In order to conceal that his income was obtained primarily from drug trafficking, defendant JAQUEL CREWS further falsely claimed that he earned $7,100 per month as an employee of Credit Rebuilders.

5. On or about November 22, 2006, through the false and fraudulent statements on defendant JAQUEL CREWS' loan application, defendant JAQUEL CREWS caused America's Wholesale Lender to make a loan of $71,200 against the 1634 Foulkrod Property. The loan was funded by a wire to the closing agency, First Option Title. As part of this loan, First Option Title disbursed $65,043.34 to defendant JAQUEL CREWS. On or about November 24, 2006, defendant JAQUEL CREWS cashed this check at a local check cashing agency.

6. On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAQUEL CREWS**

knowingly conducted, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 19 | 12/21/2005 | purchase of the 1634 Foulkrod Property |
| 20 | 11/24/2006 | cashing of check for $65,043.34 by defendant JAQUEL CREWS |

7. When conducting and willfully causing the financial transactions described in paragraph 6, above, defendant JAQUEL CREWS knew that the property involved in those financial transactions represented the proceeds of some form of unlawful activity.

8. The financial transactions described in paragraph 6, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant JAQUEL CREWS acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

## COUNTS TWENTY-ONE THROUGH TWENTY-TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about August 11, 1997, defendant MARK MILLER used the proceeds from his drug trafficking activities to purchase the premises located at 2410 Vista Street, Philadelphia, Pennsylvania, (the 2410 Vista Property).

3. In or about September 2003, defendant MARK MILLER applied for a mortgage loan on the 2410 Vista Property. In order to conceal that his income was from drug trafficking, defendant MILLER falsely claimed in his mortgage application that he had worked at Credit Consulting for more than eight years. He further provided copies of false tax returns for 2001 and 2002. The false 2001 return showed wages of $52,500, and the false 2002 return showed wages of $54,650. Defendant MILLER did not file a federal income tax return for 2001, and for 2002, he filed a federal income tax return claiming $9,000 in wages, in order to claim an Earned Income Tax Credit.

4. As a result of the false mortgage application, defendant MARK MILLER received a loan on the 2410 Vista Property for $73,080.

5. In or about July 2005, defendant MARK MILLER applied for a new mortgage loan on the 2410 Vista Property. In order to conceal that his income was from drug trafficking, defendant MILLER falsely claimed in his mortgage application that he had worked at C and J Property and Realty Concepts for more than four years. He further provided false copies of W-2s for 2003 and 2004.

6. As a result of this false mortgage application, defendant MARK MILLER obtained a loan of $154,000.00 from Decision One Mortgage Company on or about July 27, 2005 (the July 2005 Loan).

7. On or about March 16, 2007, defendant MARK MILLER transferred the title to the 2410 Vista Property. This transaction was presented as a sale, and the "purchaser," T.B., a person known to the grand jury, obtained a loan for ninety percent of the claimed purchase price. As part of the transaction, First Option Title paid off the July 2005 Loan. Also as part of the transaction, defendant MILLER obtained two checks from First Option Title, the title company responsible for the real estate closing: check 8278, in the amount of $22,412.34, and check 8279, in the amount of $2,640.95. Defendant MILLER presented check 8278 to Commerce Bank and cashed the check. Defendant MILLER used the cash to purchase Commerce Bank official check 10-50816 payable to First Option Title Company in the amount of $22,412.34. Commerce Bank official check 10-50816 was then presented to First Option Title Company as the down payment from the "buyer," T.B.

8. On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**MARK MILLER**

knowingly conducted, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 21 | 3/16/2007 | cashing of check 8278, in the amount of $22,412.34 |
| 22 | 3/16/2007 | purchase of Commerce check 10-50816 in the amount of $22,412.34 |

9. When conducting and willfully causing the financial transactions described in paragraph 8, above, defendant MARK MILLER knew that the property involved in those financial transactions represented the proceeds of some form of unlawful activity.

10. The financial transactions described in paragraph 8, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant MARK MILLER acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

**COUNTS TWENTY-THREE THROUGH TWENTY-SEVEN**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 2 through 12 and Overt Acts 1 through 55 of Count Five of this second superseding indictment are incorporated here.

2. On or about September 4, 2004, defendant MARK MILLER used the proceeds from his drug trafficking activities to purchase the premises located at 4829 Mulberry Street, located at the corner of Fillmore and Mulberry Streets in Philadelphia, Pennsylvania (the Mulberry Street Property).

3. In or about February 2006, defendant MARK MILLER applied for a mortgage loan on the Mulberry Street Property in order to obtain cash for his drug trafficking activities. In order to conceal that his income was from drug trafficking, defendant MILLER claimed in his mortgage application that he had worked at C and J Property and Realty Concepts for more than four years. He further provided copies of his purported W-2 for 2005. Each of these claims was false; defendant MILLER never worked for C and J Property and Realty Concepts.

4. As a result of this false mortgage application, defendant MARK MILLER obtained a loan of $74,400.00 against the Mulberry Street Property from Argent Mortgage Company, LLC on or about February 28, 2006. The title agency, Atlantic Search and Abstract Co, Inc (ASA), received a wire of $73,007.83 on or about March 2, 2006. As part of the loan, ASA paid the City of Philadelphia $4,965.00 on March 2, 2006 to clear a water and sewer lien. ASA also paid five checks to defendant MILLER, for a total of $54,362.94, which he cashed at a local check cashing company.

5. On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**MARK MILLER**

knowingly conducted, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 23 | 3/2/2006 | wire transfer of $73,007.83 to ASA |
| 24 | 3/2/2006 | cashing of check for $ 37,290.44 by defendant MILLER |
| 25 | 3/9/2006 | cashing of check for $ 1,680.00 by defendant MILLER |
| 26 | 3/9/2006 | cashing of check for $600.00 by defendant MILLER |
| 27 | 3/9/2006 | cashing of check for $12,815.00 by defendant MILLER |

6. When conducting and willfully causing the financial transactions described in paragraph 5, above, defendant MARK MILLER knew that the property involved in those financial transactions represented the proceeds of some form of unlawful activity.

7. The financial transactions described in paragraph 5, above, involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of Title 21, United States Code, Section 841, and defendant MARK MILLER acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and with intent to promote the carrying on of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

**NOTICE OF FORFEITURE**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. As a result of the violation of Title 21, United States Code, Sections 841(a)(1) and 846, set forth in this second superseding indictment, defendants:

**EMMANUEL MOORE,**
**a/k/a "Duck,"**
**THEODORE McFADDEN, SR.,**
**MONIQUE PEARSON,**
**a/k/a "Mo,"**
**JAQUEL CREWS,**
**a/k/a "Quelly,"**
**VINCENT CREWS,**
**a/k/a "Vinny," and**
**MARK MILLER,**
**a/k/a "Sharkey"**

shall forfeit to the United States of America:

(a) any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense; and,

(b) any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such offense, including but not limited to

1. 1727 Harrison Street
   Philadelphia, Pennsylvania;

2. 2410 Vista Street
   Philadelphia, Pennsylvania;

3. 4558 N. 19th Street
   Philadelphia, Pennsylvania;

4. 4829 Mulberry Street
   Philadelphia, Pennsylvania

5. 4847 Mulberry Street
   Philadelphia, Pennsylvania

6. 75 Meetinghouse Lane
Sicklerville, NJ:

7. 1827 Fillmore Street,
Philadelphia, Pennsylvania;

8. 1829 Fillmore Street,
Philadelphia. Pennsylvania;

9. 1630 Margaret Street
Philadelphia, Pennsylvania;

10. 1684 Margaret Street
Philadelphia, Pennsylvania;

11. 4834 Tackawanna Street
Philadelphia, Pennsylvania;

12. 1634 Foulkrod Street
Philadelphia, Pennsylvania;

13. 16 North Peach Street
Philadelphia, Pennsylvania;

14. 5004 Glenloch Street
Philadelphia, Pennsylvania

15. 1837 Foulkrod Street
Philadelphia, Pennsylvania;

16. 4906 Cottage Street
Philadelphia, Pennsylvania;

17. 4635 Dittman Street
Philadelphia, Pennsylvania

18. 1707 Harrison Street
Philadelphia, Pennsylvania

19. 1718 Harrison Street
Philadelphia, Pennsylvania

20. 1835 Harrison Street
Philadelphia, Pennsylvania

21. 4648 Edmund Street
Philadelphia, Pennsylvania

22. 6218 Gratz Street
Philadelphia, Pennsylvania

23. 6705 Ogontz Avenue
Philadelphia, Pennsylvania

24. 4800 Duffield Street
Philadelphia, Pennsylvania

25. 4734 Darrah Street
Philadelphia, Pennsylvania

26. the sum of $5,000,000.

2. If any of the property described above, as a result of any actor omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred to, sold to, or deposited with a third party;

c. has been placed beyond the jurisdiction of this Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), 28 U.S.C. § 2461, and United States Code, Section 853.

**A TRUE BILL:**

**GRAND JURY FOREPERSON**

**ZANE DAVID MEMEGER**
**United States Attorney**