IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 10-663-4, -6 |
| | : | |
| JAQUEL CREWS AND MARK MILLER | : | |

**MEMORANDUM**

**Padova, J.**                                                                                    **August 14, 2012**

On March 14, 2012, Defendants Jaquel Crews and Mark Miller were convicted by a jury of one count of conspiracy to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base ("crack") between 1986 and November 17, 2007, in violation of 21 U.S.C. § 846 (Count Five) (the "drug trafficking conspiracy"). Crews was also convicted of ten counts of laundering of monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) (Counts Eleven through Twenty). Miller was also convicted of seven counts of laundering of monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) (Counts Twenty-One through Twenty-Seven). The Government has filed Motions for Forfeiture Money Judgment against both Crews and Miller pursuant to 21 U.S.C. § 853, seeking personal forfeiture money judgments against both Crews and Miller in the amount of $5,000,000. We held a hearing on the Motions on July 31, 2012. For the reasons that follow, the Motions are granted.

## I.      LEGAL STANDARD

Federal Rule of Criminal Procedure 32.2 provides that "[a]s soon as practical after a verdict or finding of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A). "If the government seeks a personal money judgment, the court must

determine the amount of money that the defendant will be ordered to pay." Id.  We make our determination based on "evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).  The parties in this case have not submitted any additional evidence with respect to the Government's Motions for Forfeiture Money Judgment, so we decide those Motions based on the evidence in the trial record.

The Government has moved for forfeiture pursuant to  21 U.S.C. § 853, which provides in pertinent part as follows:

> Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law--
>
> (1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;
>
> (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; . . . .

21 U.S.C. §853(a).  The types of property which are subject to forfeiture pursuant to § 853 include "(1) real property, including things growing on, affixed to, and found in land; and (2) tangible and intangible personal property, including rights, privileges, interests, claims, and securities." 21 U.S.C. § 853(b).  If we find that property is subject to forfeiture pursuant to 21 U.S.C. § 853, we "enter a preliminary order of forfeiture setting forth the amount of any money judgment." Fed. R. Crim. P. 32.2(2)(A).  The preliminary order of forfeiture becomes final as to the defendant at sentencing. Fed. R. Crim. P. 32.2(4)(A).

Both Defendants were convicted of conspiracy to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base ("crack") pursuant to 21 U.S.C. § 846, which is punishable

2

by imprisonment of more than one year.   See 21 U.S.C. §§ 841(b)(1)(A), 841(b)(1)(B), 846.  The

Government is thus entitled to a forfeiture money judgment for the proceeds that the Defendants

received from the drug trafficking conspiracy and for the amount of money that the Defendants spent

to purchase cocaine in furtherance of that conspiracy.   See 21 U.S.C. § 853(a); United States v.

Harrison, No. 99 CR 934–1, 2001 WL 803695, at *1 (N.D. Ill. June 28, 2001) (granting preliminary

order of forfeiture pursuant to 21 U.S.C. § 853 in the amount of $1,000,000 where defendant

purchased well over 150 kilograms of cocaine at a price between $15,000 and $20,000 per kilogram

in furtherance of drug conspiracy because "21 U.S.C. § 853(a)(2) permits forfeiture of 'any of the

person's property used . . . in any manner . . . to commit . . . such violation'" (alterations in original)

(quoting 21 U.S.C. § 853(a)(2))).   The amount of money that we order to be forfeited by each

Defendant is not limited by the amount of that Defendant's assets at the time of his conviction, as

such a limitation "would permit defendants who unlawfully obtain proceeds to dissipate those

proceeds and avoid liability for their ill-gotten gains."  United States v. Vampire Nation, 451 F.3d

189, 202 (3d Cir. 2006); see also Harrison, 2001 WL 803695, at *1 ("Forfeiture of $1,000,000 based

upon what defendant spent may well be an empty gesture -- presumably he does not have it anymore.

But a judgment for that amount does enable the government later to seek the forfeiture of specific

substitute property pursuant to 21 U.S.C. § 853(p) and Fed.R.Crim.P. 32.2(e)." (citing United States

v. Baker, 227 F.3d 955, 967-68 (7th Cir. 2000) and United States v. Voight, 89 F.3d 1050, 1084-85

(3d Cir. 1996))).

The Government has the burden of proving the amount of money to be forfeited by the

preponderance of the evidence.  See United States v. Prather, 456 F. App'x 622, 625 (8th Cir. 2012)

("The burden is on the government to prove by a preponderance of the evidence the amount of the

proceeds that should be subject to a personal money judgment."  (citing United States v. Bieri, 21

F.3d 819, 822 (8th Cir. 1994))).  We calculate the amount of money to be forfeited as proceeds of the conspiracy pursuant to 21 U.S.C. § 853(a)(1) by multiplying the amount of drugs the defendant sold by the price he charged for those drugs.  See id. at 626 (affirming forfeiture order based on defendant's proceeds from his crack cocaine offenses where the amount of the judgment was calculated by multiplying the amount of crack cocaine the defendant said he had sold during the time period of the offense by the amount of money defendant stated that he earned from each ounce of crack cocaine he sold); see also United States v. Roberts, 660 F.3d 149, 165-66 (2d Cir. 2011) (approving calculation of forfeiture money judgment based on multiplying an estimate of the quantity of cocaine sold in the drug trafficking conspiracy by "the price it could have commanded"). We calculate the amount of money to be forfeited as property used to facilitate or commit the conspiracy pursuant to 21 U.S.C. § 853(a)(2) by multiplying the quantity of drugs the defendant purchased in furtherance of the drug trafficking offense by the price he paid for those drugs.  See United States v. Huggins, 392 F. App'x 50, 63 (3d Cir. 2010)  (affirming the district court's calculation of the amount defendant was ordered to forfeit pursuant to 21 U.S.C. § 853 by multiplying the amount of cocaine defendant stated he possessed by the price charged for that quantity of cocaine in the area of the drug trafficking offense)).  In addition, since forfeiture money judgments are based on joint and several liability, we may order that Crews and Miller each forfeit the entire amount of the proceeds of the drug trafficking conspiracy.  See id. (rejecting defendant's argument that he was not responsible for the entire amount of the proceeds of the conspiracy, "even though there was no evidence that he received all of the money" because "21 U.S.C. § 853(a)(1) 'imposes joint and several liability with respect to forfeiture.'" (quoting United States v. Pitt, 193 F.3d 751, 765 (3d Cir. 1999))).

## II.     DISCUSSION

4

The Government argues that both Crews and Miller should be held equally, and jointly and severally, liable for the full amount of the $5,000,000 forfeiture money judgment because they "both played co-extensive roles in the drug trafficking scheme for years and both fully participated in obtaining millions of dollars worth of cocaine, using drug proceeds." (Gov't Mem. at 10.)  The Government relies on the trial testimony of Emmanuel Moore, Craig Lofton, and Timothy Carter to establish the quantity and purchase price of the drugs involved in the drug trafficking conspiracy.

A.     Emmanuel Moore

Emmanuel Moore, a co-defendant of Crews and Miller who pled guilty to charges arising out of the drug trafficking conspiracy,[1] testified at trial with respect to his sales of cocaine to Crews and Miller in furtherance of the drug trafficking conspiracy as follows.  Moore obtained kilogram quantities of cocaine for Crews and Miller from Ernie Doe and Timothy Carter.  Beginning in the fall of 2002 and continuing until early 2003, Moore supplied Crews, Craig Lofton (another co-conspirator) and others who were involved in the drug trafficking conspiracy with kilogram quantities of cocaine obtained from Ernie Doe.  (3/6/12 N.T. at 20-22.)  Crews paid Moore $24,000 per kilogram for cocaine that Moore purchased from Doe.  (Id. at 25.)  Moore supplied Crews with approximately 25 kilograms of cocaine from Doe between the fall of 2002 and early 2003.  (Id. at 25-26.)  Based on Moore's testimony, it appears that for four months from the fall of 2002 until early 2003, Crews purchased at least 25 kilograms of cocaine from Moore that originated with Ernie Doe at $24,000 per kilogram for a total of $600,000.

Moore subsequently purchased cocaine from an individual who lived in California named Timothy Carter.  (Id. at 25-27.)  Crews paid Moore $18,000 - $19,000 per kilogram for cocaine that

---

[1]Moore pled guilty to Counts 1-5 of Second Superseding Indictment No. 10-663 on October 18, 2011.

Moore purchased from Carter and had sent to Philadelphia from California.  (Id. at 26, 35.)  Moore regularly flew to California with money in his luggage that had been given to him by Crews, Miller and others, which he gave to Carter.  (Id. at 27-30.)  From May 2003, until he was stopped at the Philadelphia International Airport in October 2004, Moore traveled to California with money to purchase cocaine twice a week.  (Id. at 30, 34.)  Some of those flights were paid for by Crews.  (Id. at 43.)  Moore initially purchased one to two kilograms of cocaine per week from Carter, but his business grew to at least 20 kilograms per week.  (Id. at 28, 30, 34-35.)  On average, Moore purchased at least five kilograms of cocaine a week from Carter using money provided to him by Crews, who either personally gave the money to Moore, or, if he was busy, sent the money with Miller.  (Id. at 30.)  Crews purchased this cocaine for his "circle," meaning Craig Lofton, Vincent Crews[2] and Mark Miller.  (Id. at 31.)  Based on Moore's testimony, it appears that for the 18 months from May 2003 through October 2004, Crews and Miller purchased an average of 20 kilograms of cocaine per month from Moore, that Moore obtained from Carter, at a price of $18,000 per kilogram, for a total of $6,480,000.  (Id. at 28-35.)

Moore was arrested in November 2004 on unrelated charges and was held in state custody. (Id. at 48-49.)  He and the other members of the drug trafficking conspiracy continued to sell cocaine while he was detained.  (Id. at 49-50.)  Moore testified that from May 2005 to October 2006, Crews, Miller, Lofton and Kevin Isley flew to California to obtain the cocaine from Carter.  (Id. at 51.) Moore testified that he supplied Crews with 2 kilograms of cocaine per week through Carter during this time.  (Id. at 51-52.)  Crews paid approximately $20,000 per kilogram for this cocaine.  (Id. at 51.)  Based on Moore's testimony, it appears that for the 17 months from May 2005 through October

---

[2]Vincent Crews is Jaquel Crews's nephew and co-conspirator.  He pled guilty to Count 5 of Second Superseding Indictment No. 10-663 on October 19, 2011.

2006, Crews and Miller purchased at least 8 kilograms of cocaine per month from Carter at a price of $20,000 per kilogram for a total of $2,720,000.

      B.    <u>Timothy Carter</u>

Timothy Carter testified that Moore traveled to Brentwood, California to purchase cocaine from him beginning in June 2004.  (3/8/12 N.T. at 62.)  Moore initially made one to two trips to California per week to purchase two to five kilograms of cocaine per trip.  (<u>Id.</u>)  Later in 2004, Moore traveled to California twice a week and eventually increased his purchases to approximately 25 kilograms per trip.  (<u>Id.</u>)  Moore brought the money with him on flights from Philadelphia in carry-on bags.  (<u>Id.</u> at 63.)  After Moore gave Carter the money, Carter would ship the cocaine to addresses in Philadelphia provided to him by Moore.  (<u>Id.</u> at 65-67.)  Carter was eventually introduced to Crews, Doe, Lofton, Isley and others.  (<u>Id.</u> at 63.)  After Moore's money was seized in the Philadelphia airport, he asked Carter to travel to Philadelphia to pick up the money and to use that money to purchase cocaine in California for him (Moore).  (<u>Id.</u> at 74.)  From the end of October 2004 through 2005, Carter went to Philadelphia to pick up money for cocaine nine or ten times, and picked up anywhere from $20,000 and $200,000 per trip.  (<u>Id.</u> at 74, 77.)  Carter would then ship the cocaine back to addresses in Philadelphia provided to him by members of the drug trafficking conspiracy.  (<u>Id.</u> at 78.)  On one occasion in 2006, Moore's father traveled to California to purchase cocaine from Carter.  (<u>Id.</u> at 79-80.)  Carter was arrested in June 2007 (<u>Id.</u> at 101.)

There is a conflict in the testimony of Moore and Carter with respect to the time period in which Moore personally purchased cocaine from Carter in California that he sold to Crews and Miller.  Moore testified that Crews and Miller purchased from him an average of 20 kilograms of cocaine per month that originated with Carter during the time period from May 2003 through October 2004.  Carter testified that Moore began to purchase cocaine from him in June 2004.  Since

Carter's testimony favors the Defendants we will, in an abundance of caution, use the time period provided by Carter in our calculation of the amount of cocaine that Crews and Miller purchased from Moore, that Moore personally obtained from Carter. Thus, we calculate the amount of cash that Crews and Miller paid to Moore for cocaine that Moore personally obtained from Carter in California, as follows: Crews and Miller purchased an average of 20 kilograms of Carter's cocaine per month from Moore at a price of $18,000 per kilogram for a period of five months (from June 2004 through October 2004) for a total of $1,800,000.

     C.    <u>Craig Lofton</u>

Lofton testified that he purchased cocaine from both Miller and Crews and that he sold cocaine to both Miller and Crews during the course of the drug trafficking conspiracy. Lofton obtained cocaine for resale from Miller beginning in 1987, at which time Miller provided him with one-half ounce of cocaine per week. (3/5/12 N.T. at 35.) Lofton was imprisoned for much of the time between 1989 and 2002. (<u>Id.</u> at 36-41.) In 2002, after he was released from prison, Lofton began dealing drugs again and obtained 9 ounces of cocaine a week from Crews for $5800. (<u>Id.</u> at 47-48.) Crews was also distributing cocaine to Miller at that time. (<u>Id.</u> at 48-49.) In addition to purchasing cocaine from Crews, from 2002 through 2003, Lofton sold Crews two to three kilograms of cocaine per week that he obtained from Ernest Doe for $20,000 or $21,000 per kilogram. (<u>Id.</u> at 53-54, 75-77.) In 2004, Lofton obtained approximately 50 kilograms of cocaine per month from Mark Walker and sold half of that amount, 25 kilograms of cocaine per month, to Jaquel Crews, who paid him $20,000 per kilogram. (<u>Id.</u> at 77-79) Jaquel Crews furnished 2-3 kilograms per month to Miller from the cocaine he obtained from Lofton. (<u>Id.</u> at 79.)[3]

---

[3]The Government does not rely on the money that Crews and Miller spent to purchase cocaine from Lofton that originated with Ernie Doe and Mark Walker to support its Motion for a

Lofton also testified that he met Carter through Moore. (Id. at 81.) Lofton purchased cocaine from Carter from 2004 through 2006. (Id.) Sometimes, when Lofton purchased cocaine from Carter, he would fly to California with the money for the cocaine, at other times, Carter would fly to Philadelphia to pick up the money. (Id. at 82.) Carter charged Lofton $15,000 per kilogram and Lofton sold that cocaine for $21,000 per kilogram. (Id.) Crews, Miller, Isley and others would sometimes fly to California with Lofton. (Id. at 83.) In 2004, Lofton flew to California two or three times a week, taking a couple hundred thousand dollars at a time in his luggage, and purchased 12 kilograms of cocaine per trip. (Id.) Lofton obtained the money for the cocaine from Jaquel and Vincent Crews, Miller, and Monique Pearson (for Emmanuel Moore). (Id. at 83-84.) After Lofton gave the money to Carter, Carter would send the cocaine to Philadelphia through overnight delivery. (Id. at 84.)

Lofton also testified that when Moore's money was seized at the Philadelphia airport, both Moore and Crews told him that the money that had been seized had belonged them. (Id. at 85.) In 2005, Lofton continued to fly to California two to three times a week with at least a couple hundred thousand dollars each time to obtain cocaine. (Id. at 86-87.) Lofton paid $14,500 to $15,000 per kilogram at that time and sold the cocaine for $20,000 to $21,000 per kilogram. (Id. at 87.) During this time period, Miller personally gave Lofton $30,000 to take to California to purchase two kilograms of cocaine on two occasions. (Id. at 87-88.) Crews paid for Lofton's flights to California and also paid for flights for other people, such as Isley. (Id. at 89.) Once, in 2005, Lofton was

---

forfeiture money judgment in the amount of $5,000,000. Consequently, we have not included the money spent on the cocaine that Lofton testified he provided to Crews and Miller from Doe and Walker in our calculation of the amount of money Defendants spent to purchase cocaine in furtherance of the drug trafficking conspiracy between 2002 and 2006. We note, however, that including those purchases would support the Government's Motion.

stopped by DEA agents in the Los Angeles Airport because he was carrying a large amount of United States currency. (Id. at 90-91.) Lofton was with Crews and Isley when this happened. (Id. at 90.) After this occurred, Lofton began flying to Las Vegas to meet with Carter instead of California, so that, if he were stopped, he could say that he had large amounts of currency for gambling. (Id. at 91.) Lofton also testified to flying to California or Las Vegas with Miller in 2005 to deliver money to Carter. (Id. at 93.) He also testified that Carter once sent a package of cocaine from California to 1835 Harrison Street in Philadelphia that was intended for Miller. (Id. at 93-95.)    Lofton also testified that he obtained more than $100,000 from Crews at Crews's Sicklerville home for the purchase of cocaine on one occasion in February 2006. (Id. at 96.)

      D.     Other Witnesses

The trial testimony of Moore, Carter and Lofton cited above was corroborated at trial by the testimony of other witnesses, including Philadelphia Police Officer Barry Bre'Dell and IRS Special Agent Michael Pohar. The Government also relies on the trial testimony of Michael Tucker and James Miller to establish that Crews and Miller sold cocaine in furtherance of the drug trafficking conspiracy. The Government further relies on the trial testimony of Michael Durant to establish additional purchases of cocaine by Crews and Miller in furtherance of the drug trafficking conspiracy.

      1.     Police Officer Barry Bre'Dell

Philadelphia Police Officer Barry Bre'dell, who is assigned to the Drug Enforcement Administration, Airport Unit, testified that Moore was stopped at the Philadelphia International Airport by TSA screeners on his way to Los Angeles, California on October 24, 2004 because the screeners found large amounts of United States currency in Moore's carry-on luggage. (3/6/12 N.T. at 92-94.) The currency was found in three bags, a pullman, a smaller bag found inside the pullman,

10

and a duffel bag.  (Id. at 97-98.)  A dog that was assigned to Bre'Dell's unit at the airport indicated positively for the presence of narcotics in Moore's duffel bag.  (Id. at 99-100.)  Officer Bre'Dell seized a total of $344,314 in United States currency from Moore on October 24, 2004.  (Id. at 101.)

2.      IRS Special Agent Pohar

IRS Special Agent Michael Pohar confirmed, through an analysis of Crews's credit cards, that Crews paid for several airline tickets for himself, Moore, and others involved in the drug trafficking conspiracy to fly to Los Angeles, California during the time period in which Moore testified that the members of the conspiracy flew to California to purchase cocaine from Carter. Agent Pohar testified that Crews purchased airline tickets for himself and Moore to fly from Philadelphia International Airport to Los Angeles on September 14, 2004, with his (Crews's) American Express card.  (3/8/12 N.T. at 24, 26.)  Crews also used his American Express card to purchase plane tickets for himself, Lofton and Isley to fly from Philadelphia to Los Angeles on June 7, 2005.  (Id. at 27-28.)  Crews also used his American Express card to purchase an airline ticket for Miller on August 3, 2005.  (Id. at 29.)  Crews again used his American Express card to purchase airline tickets for Miller to fly round-trip from Philadelphia to Los Angeles, departing on October 25, 2005.  (Id. at 32.)  Crews used his American Express card to purchase tickets for Craig Lofton to fly round-trip from Philadelphia to Las Vegas, departing November 6, 2005.  (Id. at 32-33.)  The Government also entered into evidence at trial duplicate copies of Crews's American Express bills for September 2004 and for the time period between May 2005 and August 2005. (Gov't Exs. 127.2, 127.3.)  The September 2004 bill shows the purchase of airline tickets for Crews and Moore to travel round-trip from Philadelphia to Los Angles departing on September 14, 2004, via US Airways. (Gov't Ex. 127.2.)  The May - August 2005 bill shows the purchase of airline tickets for Craig Lofton, Kevin Isley and Crews to travel from Philadelphia to Los Angeles departing on June 7, 2005

11

via US Airways.  (Gov't Ex. 127.3.)

### 3.   Michael Tucker

Tucker testified that he first purchased cocaine from Miller in the spring of 1986, when Miller sold him two ounces of cocaine for $1500.  (3/1/12 N.T. at 9.)  He then began purchasing four and one-half ounces of cocaine base from Miller for $2800 once a week.  (Id. at 10.)  By 1993, Tucker was purchasing one-half kilogram of cocaine base from Miller every 2 weeks for $12,500.  (Id. at 17.)  In 1996, Tucker purchased cocaine base in kilogram quantities from Miller, at a price of $28,000 per kilogram.  (Id. at 22.)  In 2001, Tucker was again purchasing one-half kilogram quantities from Miller, for $14,000 for each one-half kilogram package of cocaine base.  (Id. at 19-20.)  In 1991 and 1992, when he was purchasing cocaine base from Miller, Tucker also purchased cocaine base from Crews for $2,800 for four and one-half ounces.  (Id. at 20.)  All together, Tucker resold between 10 and 50 kilograms of cocaine base that he obtained from Crews and Miller in the Frankford section of Philadelphia.  (Id. at 49.)

### 4.   James Miller

James Miller met Jaquel Crews through Vincent Crews in 2003 or 2004.  (3/1/12 N.T. at 112.)  James Miller purchased cocaine from Crews in four and one-half ounce quantities for $2,400 to $3,000 once or twice a week from 2003 to 2005.  (Id. at 112-14.)  James Miller met Mark Miller through Crews.  (Id. at 114-15.)  James Miller also sold cocaine to Crews and Mark Miller.  He initially sold a few kilograms of cocaine to Crews in 2004 or 2005 for $19,000 to $21,000 a kilogram. (Id. at 115.)  Starting in 2005, he sold two or three kilograms of cocaine to Crews once a week for around $19,000 or $21,000 per kilogram.  (Id. at 117.)  On one occasion in early 2006,

James Miller sold two kilograms of cocaine to Crews and Mark Miller together for $40,000.[4]  (Id.

at 116-17.)  James Miller also knew Lofton and was aware that Lofton, Crews, Vincent Crews, and

Mark Miller flew to California with money and arranged for the shipment of cocaine back to

Philadelphia.  (Id. at 124.)

       5.   Michael Durant

Durant testified that he knew Doe and Lofton and that Lofton introduced him to Crews.

(3/2/12 N.T. at 137-38, 143.)  Durant sold 20-25 kilograms of cocaine to Crews over the course of

one to two years beginning in 2004 for around $20,000 per kilogram.  (Id. at 144-45.)  Durant also

met Miller through Lofton.  (Id. at 145.)  Once, in 2004 or 2005, Durant also sold two kilograms of

cocaine to Miller for approximately $20,000 per kilogram.[5]  (Id. at 146-47.)

We find that the Government has established, by a preponderance of the evidence, through

trial testimony and exhibits entered into evidence at trial, that Crews and Miller purchased at least

261 kilograms of cocaine in furtherance of the drug trafficking conspiracy for a total purchase price

of $5,120,000.  They purchased at least 25 kilograms of cocaine from Ernie Doe through Moore from

the fall of 2002 through early 2003 for a price of $600,000; they purchased least 100 kilograms of

---

[4]The Government does not rely on the money that Crews and Miller spent on cocaine that they purchased from James Miller to support its Motion for a forfeiture money judgment in the amount of $5,000,000.  Consequently, we have not included the money spent on the cocaine that James Miller testified he sold to Crews and Mark Miller in our calculation of the amount of money that Miller and Crews spent to purchase cocaine in furtherance of the drug trafficking conspiracy between 2002 and 2006.  We note, however, that including those purchases would support the Government's Motion.

[5]The Government does not rely on the money that Crews and Miller used to purchase cocaine from Durant to support its Motion for a forfeiture money judgment in the amount of $5,000,000.  Consequently, we have not included the money spent on the cocaine that Durant testified he provided to Crews and Miller in our calculation of the amount of money that Crews and Miller spent to purchase cocaine in furtherance of the drug trafficking conspiracy between 2002 and 2006.  We note, however, that including those purchases would support the Government's Motion.

cocaine from Timothy Carter through Moore from June 2004 through October 2004 for a price of $1,800,000; and they purchased at least 136 kilograms of cocaine from Carter through Moore from May 2005 though October 2006 for $2,720,000. Therefore, we conclude the Government has established by a preponderance of the evidence that Crews and Miller used over $5,000,000 to commit the drug trafficking conspiracy and thus, that this amount is subject to forfeit pursuant to 21 U.S.C. 853(a)(2).

        E.      <u>Proceeds of the Drug Trafficking Conspiracy</u>

The Government argues, in the alternative, that the cash that Crews and Miller used to purchase that 261 kilograms of cocaine is subject to forfeiture pursuant to 21 U.S.C. § 853(a)(1), because that cash was, itself, proceeds of the conspiracy. The Government contends that the cash Crews and Miller used to purchase cocaine between 2002 and November 17, 2007, had to have been proceeds of the conspiracy, because Crews and Miller had very little legitimate income during that time.

The Government relies on the trial testimony of IRS Special Agent Kenneth Kelly and Social Security Administration employee Janette Budney, who both testified that Crews and Miller had little reported legitimate income during the time they were purchasing cocaine through Emmanuel Moore. Budney, an operations supervisor for the Social Security Administration, testified that according to Social Security records, Crews had no reported income in 2002. 3/1/12 N.T. at 213, 219.) Crews had reported income from Credit Repair Consulting, owned by Deric Dandridge, of $8,400 in 2003; $20,800 in 2004; $21,200 in 2005 and $9,200 in 2006. (<u>Id.</u> at 219; Gov't Ex. 155A.) Miller's total reported income was only $12,506.39 between 1986 and 2007. (3/1/12 N.T. at 221; Gov't Ex. 155B.) Miller had no reported income in 2002; he had income of $9,460 in 2003; and no reported income from 2004-07. (Gov't Ex. 155B.)

14

Deric Dandridge testified at trial that he never employed Crews, but that Crews went to him in August of 2003 and asked to be put on Dandridge's payroll so that he wold have legitimate income. (3/1/12 N.T. at 180-81.) Dandridge agreed and put Crews on his payroll at $10/hour, $400 a week. (Id. at 181-82.) Dandridge had an outside payroll company and that company debited Dandridge's bank account to pay all employee taxes. (Id. at 182.) Consequently, Dandridge paid employment taxes for Crews and a paycheck was created for Crews. (Id. at 183.) Crews sometimes cashed the checks that the payroll company prepared for him; when he did so, he would repay that money to Dandridge. (Id. at 189.) Crews also repaid Dandridge for the money that was paid for his taxes. (Id. at 190.)

Crews filed a tax return in 2002, showing $20,400 in total income and identifying his occupation as construction. (Gov't Ex. 148C.) Crews filed an amended tax return for 2003, showing total income of $30,190 and stating his occupation as credit repair. (Gov't Ex. 148D.) Crews reported $20,800 in wages on his 2004 tax return and identified his occupation as credit consultant. (Gov't Ex. 148E.1.) His amended 2004 tax return showed total income of $49,419. (Gov't Ex. 148E.2.) IRS Agent Kelly testified that the 2004 amended return added rental income to Crews's income as a credit consultant. (3/5/12 N.T. at 258-59.) Crews reported income of $21,200 from his employment in credit repair on his 2005 tax return, as well as $32,657 in rental income and $30,000 in gambling winnings. (Gov't Ex. 148F.) Crews reported $8,800 in wages from credit repair and $ 26,035 in rental income on his 2006 tax return. (Gov't Ex. 148G; 3/5/12 N.T. at 259-60.)

IRS Agent Kelly testified that Miller filed tax returns in 2002, 2003 and 2004, reporting income of $9,000 in 2002, $9,460 in 2003 and $11,220 in 2004. (3/5/12 N.T. at 251-52, 266, Gov't Exs. 145B-D, 159K.) Miller did not file tax returns for 2005-2007. (3/5/12 N.T. at 266; Gov't Ex. 159K.)

There is evidence in the trial record that both Crews and Miller received money from the mortgaging of residential real estate they owned in Philadelphia during the relevant time period. (See Gov't Exs. 159A-159G.)  There is also evidence of lavish spending by both Crews and Miller during the same time period.  (See Gov't Exs. 126A, 126B, 127.1-127.11, 128A.1, 128B.1, 133.3, 141B.1, 143.)

We find that the Government has established, by a preponderance of the evidence, that Crews did not earn any employment income from Deric Dandridge or from credit consulting or credit repair.  We further find, by a preponderance of the evidence, that the amount of income reported by Crews and Miller to the Social Security Administration and the IRS, together with the amount of money that they derived from real estate transactions, less their expenditures, was far less than the amount of money that they used to purchase cocaine during the period from 2002 to 2006.  We conclude, accordingly, that the Government has established, by a preponderance of the evidence, that there was no likely source of the cash used by Crews and Miller to purchase cocaine in furtherance of the drug trafficking conspiracy except for the proceeds of that drug trafficking conspiracy and that the cash was, itself, proceeds of the drug trafficking conspiracy and thus subject to forfeiture pursuant to 21 U.S.C. § 853(a)(1).[6]

F.    The Defenses

Crews and Miller have raised a number of defenses to the Motion for Forfeiture Money

---

[6]The Government correctly points out that 21 U.S.C. § 853(d) creates a rebuttable presumption that the property of a person convicted of a drug trafficking crime is subject to forfeiture if the property was acquired during the time period of the offense and there is "no likely source for such property other than" the drug trafficking crime.  We find that these elements have been met in this case as to both Crews and Miller.  However, since we have concluded that the $5,000,000 is subject to forfeiture pursuant as proceeds of the offense pursuant to § 853(a)(1) and as property used to commit the offense pursuant to § 853(a)(2), we do not rely on the rebuttable presumption created by § 853(d) in this case.

Judgment.  Crews argues that the Motion should be denied because it is based primarily on the testimony of Moore, who is not a credible witness.  They both also make various legal arguments regarding forfeiture.

1.      Emmanuel Moore's credibility

Crews argues in that the Motion for Forfeiture Money Judgment should be denied because Moore's testimony was perjured and is not credible.  Crews relies on Moore's opposition to the Government's motion to forfeit the cash it seized from him at Philadelphia International Airport on October 24, 2004.  In that forfeiture case, United States v. Three Hundred Forty Four Thousand Three Hundred Fourteen Dollars in United States Currency, Civ. A. No. 05-1552 (E.D. Pa.), Moore falsely claimed that the cash found in his carry-on baggage by TSA was not drug money.  See id., Answer to Compl. ¶ 27, Docket No. 6 (May 5, 2005).  As Moore now admits that he was carrying that money to California to purchase cocaine (3/6/12 N.T. at 35-42), Crews argues that we should thus discredit Moore's testimony in this case on the ground of "*falsus in uno, falsus in omnibus*." See Bennun v. Rutgers State Univ., 941 F.2d 154, 179 (3d Cir. 1991) (citing Black's Law Dictionary 543 (5th ed. 1979))).  Crews further argues that Moore's testimony that he continued his drug operations while he was incarcerated though smuggled cell phones is an obvious lie because he could not have done so without detection by prison guards.

We observed Moore during his testimony during the trial of this matter on March 6, 2012. We found his testimony to be credible.[7]  Moreover, Moore's testimony was corroborated by the testimony of Craig Lofton, Timothy Carter (except as to the time in which Moore began to purchase

---

[7]We do not find that the inconsistency between Moore's testimony and Carter's testimony with respect to the month and year in which Moore began to purchase cocaine from Carter generally undermines Moore's credibility.  As we noted, we only credited Carter's testimony over Moore's because Carter's testimony was more favorable to Defendants.

cocaine from Carter),  Philadelphia Police Officer Barry Bre'Dell, and IRS Special Agent Michael Pohar.  We conclude that the falsehoods Moore uttered in connection with the seizure of $344,314 at the Philadelphia International Airport and Moore's testimony regarding his activities in prison do not sufficiently undermine the credibility of his March 6, 2012 trial testimony so as to prevent the Government from meeting its burden of establishing, by a preponderance of the evidence, that Crews and Miller used at least $5,000,000 in cash proceeds from the drug trafficking conspiracy to purchase cocaine to commit the drug trafficking conspiracy.

2.      Legal arguments

Miller and Crews both argue that the Government's Motion for Forfeiture Money Judgment is not authorized by law because the Government seeks the forfeiture of money used to commit or facilitate the commission of the drug trafficking conspiracy, not the proceeds of the drug trafficking conspiracy. This argument is based on an incomplete understanding of the Government's position, as the Government made it clear in its Memorandum of Law and during the July 31, 2012 Hearing that it seeks forfeiture of the $5,000,000 both as proceeds of the drug trafficking conspiracy pursuant to 21 U.S.C. § 853(a)(1), and as property used to commit or facilitate the offense pursuant to 21 U.S.C. § 853(a)(2). Moreover, neither of the Defendants has provided us with any authority that supports their argument that forfeiture pursuant to 21 U.S.C. § 853(a)(2) is limited to property which has been seized by the police and, therefore, we cannot order forfeiture of cash that was used by the Defendants to purchase cocaine in the past. We conclude that the law in this area is correctly stated in Harrison, 2001 WL 803695, at *1, and further conclude that the Government is entitled to a forfeiture money judgment for the amount of cash used by Defendants to purchase cocaine to commit, or to facilitate the commission of, the drug trafficking conspiracy.

Defendants also argue that the Government has failed to satisfy its burden of proving the amount of cash they used to purchase cocaine by a preponderance of the evidence because the Government has only presented evidence of approximate amounts of cocaine purchased and the approximate prices of that cocaine and has not submitted any evidence of the specific dates on which that cocaine was purchased. "[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture." Roberts, 660 F.3d at 166. "Rather, district courts may 'use general points of reference as a starting point' for a forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence. Id. (quoting United States v. Treacy,

19

639 F.3d 32, 48 (2d Cir. 2011)).  We find that the trial evidence on which we have based our calculations of the amount of cash that Crews and Miller used to purchase cocaine in furtherance of the drug trafficking conspiracy is as specific as the evidence on which the forfeiture calculations were based in <u>Roberts</u>, 660 F.3d at 165-66, and in <u>Huggins</u>, 392 F. App'x at 63.  We conclude that this evidence is sufficient to establish, by a preponderance of the evidence, that Crews and Miller used more than $5,000,000 to purchase cocaine in furtherance of the drug trafficking conspiracy between the fall of 2002 and October 2006.

Defendants Crews and Miller also argue that the issuance of an order granting the Government's Motion for Forfeiture Money Judgment would violate their rights to procedural due process because the Government could use such an order to execute against Defendants' real property without having to follow the procedures for the forfeiture of real property provided by Federal Rule of Criminal Procedure 32.2.  Neither Crews nor Miller has provided us with any authority that supports this argument.  Defendants also argue that we lack the authority to enter a personal money judgment against them as such a judgment would not be a judgment against specific property.  This argument is foreclosed by Circuit precedent.  <u>See</u> <u>United States v. Croce</u>, 209 F. App'x 204, 213 (3d Cir. 2006) (citing <u>Vampire Nation</u>, 451 F.3d at 202-03).  We conclude that 21 U.S.C. § 853 permits the Government to seek the forfeiture of cash and that Federal Rule of Civil Procedure 32.2 permits the Government to seek a personal money judgment against Defendants rather than the forfeiture of specific real or personal property.

Crews also argues that joint and several liability for criminal forfeiture of facilitating property is not authorized by law.  Crews argues that the language of 21 U.S.C. § 853(a)(2) that authorizes the forfeiture of "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation" restricts forfeiture of facilitating

20

property to just the money that he himself used to facilitate the offense, and that he cannot be held jointly and severally liable for money that Miller used to facilitate the offense. Crews has not supplied us with any authority that supports this argument. Moreover, as we discussed above, the Government seeks forfeiture pursuant to 21 U.S.C. § 853(a)(1) as well as 21 U.S.C. § 853(a)(2) and the Third Circuit has specifically found that forfeiture should be imposed on co-conspirators joint and severally pursuant to 21 U.S.C. § 853a)(1). See United States v. Pitt, 193 F.3d 751, 765 (3d Cir. 1999) ("21 U.S.C. § 853(a)(1) imposes joint and several liability with respect to forfeiture." (citing United States v. McHan, 101 F.3d 1027, 1043 (4th Cir. 1996))). Accordingly, we reject Crews's argument.

Crews further argues that a recent opinion by the Supreme Court has invalidated the revision of the Federal Rules of Criminal Procedure that abolished the right to a jury trial for criminal forfeiture. Crews relies on Southern Union Co. v. United States, 132 S. Ct. 2344 (2012), in which the Supreme Court held that Apprendi v. New Jersey, 530 U.S. 466 (2000), applies to sentences of criminal fines. Id. at 2348-49. In Apprendi, the Supreme Court held that the Sixth Amendment right to a jury trial applies to "'any fact that increases the penalty for a crime beyond the prescribed statutory maximum[,]'" "'[o]ther than the fact of a prior conviction.'" Southern Union, 132 S. Ct. at 2349-50 (quoting Apprendi, 530 U.S. at 490). The Supreme Court concluded in Southern Union that this approach also applies to a sentence of a criminal fine imposed on a corporation. Id. at 2350-51 (footnotes omitted) (quoting Oregon v. Ice, 555 U.S. 160, 168, 170 (2009)). Crews argues that, applying this logic, there can be no difference between fines and forfeiture with respect to the application of Apprendi. However, our findings today have not increased the statutory maximum that Crews can forfeit. Indeed, there is no statutory maximum in ths respect so Apprendi, and its progeny, are plainly inapposite. Thus, we must apply Rule 32.2 as it is written, and pursuant to the

law of this Circuit, "that the amount a defendant must forfeit . . . need not be admitted or proved to

a jury beyond a reasonable doubt."   United States v. Leahy, 438 F.3d 328, 331 (3d Cir. 2006) (*en*

*banc*) (rejecting the argument that "the imposition of forfeiture by the District Court under a

preponderance of the evidence standard violated [the defendants'] Sixth Amendment" rights under

the Apprendi rule).

        We conclude that the arguments made by Defendants are insufficient to undermine the

Government's proof that the cash used by Crews and Miller to purchase cocaine in furtherance of

the drug trafficking conspiracy between 2002 and 2006 is subject to forfeiture.

## III.   CONCLUSION

        For the foregoing reasons, we conclude that the Government has established, by a

preponderance of the evidence, that Defendants Crews and Miller together used in excess of

$5,000,000 in cash, which cash constituted proceeds of the drug trafficking conspiracy, to purchase

cocaine to commit, or to facilitate the commission of, the drug trafficking conspiracy.  We further

conclude, accordingly, that the $5,000,000 in cash is property that is subject to forfeiture pursuant

to 21 U.S.C. §§ 853(a)(1) and 853(a)(2) and that Crews and Miller are jointly and severally liable

for that amount.  The Government's Motion for Forfeiture Money Judgment is, therefore, granted.

Appropriate Orders follow.


                                        BY THE COURT:

                                        /s/ John R. Padova

                                        _____

                                        John R. Padova, J.