**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 10-663-4** |
| **JAQUEL CREWS,**<br>**a/k/a "Quelly"** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and K.T. Newton, Assistant United States Attorney for the District, hereby files its Sentencing Memorandum.

## I. STATUS OF THE DEFENDANT

On November 3, 2010, defendant Jaquel was charged in a superseding indictment, with conspiring to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base (Count Five). Crews was arrested on that charge on November 9, 2010, was held briefly in federal detention until November 30, 2010. On December 15, 2010, the grand jury returned a second superseding indictment, charging Crews with additional crimes – ten counts of money laundering (Counts 11 through 20). A jury convicted Crews on these eleven charges on March 14, 2012. He was taken into custody at that time.

## II. MAXIMUM PENALTY

The charges against Jaquel Crews carry the following maximum statutory sentences:

**Count 5** (conspiracy to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base)

Life imprisonment, a mandatory minimum twenty year prison term (851 Notice filed for prior felony drug conviction), $20,000,000 fine, a mandatory minimum of five years supervised release, up to lifetime supervised release, and a $100 special assessment.

**Counts 11-20** (money laundering)

Twenty years imprisonment, $500,000 fine, 3 years supervised release, and a $100 special assessment per count.

The maximum statutory penalty Jaquel Crews faces is lifetime imprisonment, twenty years' mandatory minimum imprisonment, a mandatory minimum ten years supervised release up to a lifetime of supervised release, $25,000,000 fine, and a $1,100 special assessment.

## III. GUIDELINE IMPRISONMENT/SUPERVISED RELEASE/FINE RANGES

The Probation Office correctly calculated the defendant's offense level, Criminal History category, and sentencing guidelines range.

The applicable guideline for the distribution of cocaine is U.S.S.G. § 2D1.1(a)(3) [Drug Quantity Table], and the applicable drug quantity is more than 150 kilograms of cocaine. Based on the testimony presented by other members of the Frankford Drug Trafficking Association at the trial of Jaquel Crews and Mark Miller, the government has conservatively calculated that Jaquel Crews is responsible for the possession and distribution of over 1000 kilograms of cocaine. A chart with those calculations is attached. Thus, Jaquel Crews' base offense level is 38 pursuant to U.S.S.G. § 2D1.1(a)(1). Four points are added pursuant to U.S.S.G. § 3B1.1(a), as Jaquel Crews was a leader and organizer in the Frankford DTA, for an Offense Level of 42, and an additional two points are added, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because Crews was convicted of money laundering offenses under 18 U.S.C.

§ 1956, for a final offense level of 44. Crews has a prior conviction for a felony drug offense, and was trafficking cocaine and crack cocaine in connection with the offenses of conviction while on supervised release. He, therefore, has 5 criminal history points and is in Criminal History category III, with a guideline range of lifetime imprisonment.

## IV. SENTENCING RECOMMENDATION

Defendant Jaquel Crews Moore was a major drug trafficker, trafficking in cocaine and crack cocaine in Philadelphia, for most of his adult life, participating in the purchase and distribution of hundreds of kilograms of cocaine and the processing and distribution of crack cocaine with many others, including other members of the Frankford DTA, for over two decades. This illegal activity cannot be minimized or ignored.

The highest possible prison sentence is warranted and called for by application of the Sentencing Guidelines. Jaquel Crews' guideline range for imprisonment is life imprisonment, with a mandatory minimum term of imprisonment of 240 months. The government contends that Crews' long-term, continued criminal drug trafficking requires the imposition of a significant term of imprisonment. This type of illegal drug trafficking must be deterred, and the most effective deterrent for Jaquel Crews, as well as others who may be tempted in the same way, is a guidelines period of imprisonment. Indeed, a thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) indicates that the most appropriate sentence would be one within the advisory guideline range.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal

offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]

**Consideration of the 3553(a) Factors**

**1. The nature and circumstances of the offense and the history and characteristics of the defendant**

**a. The nature and circumstances of the offense**

Jaquel Crews' crimes are, without a doubt, very, very serious. He, with other members of the Frankford DTA, poured huge quantities of cocaine and crack cocaine into the

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

community in which he lived for over two decades. Vincent Crews, Craig Lofton, Emmanuel Moore, James Miller, Michael Crosby, Michael Durant. Vincent Graham, Erik McCoy and Donielle Fletcher all testified at trial about their knowledge of, and/or participation in, Crews' long-term and high quantity cocaine and crack cocaine distribution. A very conservative estimate of the cocaine distributed by Crews between 2001 and 2006 is over 1,000 kilograms. In addition, extensive testimony about Crews' money laundering, through the purchase, renovation and mortgage of residences in the Frankford area, was presented at trial.

**b. <u>The history and characteristics of the defendant</u>**

As noted in the Presentence Report, this conviction does not marks Jaquel Crews' first drug trafficking conviction. In November 1995, Crews entered a guilty plea to the charge of conspiracy and distribution of five or more grams of cocaine base. PSR ¶ 100. On January 22, 1996, he was sentenced to 56 months imprisonment and four years supervised release. His supervised release began on April 26, 2000 and ended on April 25, 2004. PSR ¶ 100. During that period alone, while on federal supervised release, Crews conservatively distributed almost 200 kilograms of cocaine.

Jaquel Crews grew up in a stable home in the Frankford section of Philadelphia with two parents and four siblings. His father worked at the United States Naval Yard and the Bookbinders factory and his mother stayed at home to raise her children, and, according to Crews, gave him "good values and a good work ethic." PSR ¶¶ 113-117. . He withdrew from high school in 10th grade, and, while on pretrial release in this case began to take GED preparatory course in October 2011. PSR ¶ 124. Crews does not appear to have had any legitimate employment history, other than operating a barbershop given to him by his father in the early 1990s. PSR ¶ 126-127. Crews has no history of substance abuse. PSR ¶ 123.

During his years of drug trafficking activities, Jaquel Crews enjoyed a lavish lifestyle through his drug proceeds. Evidence of this lifestyle included: a large home in Sicklerville with a home theater equipped with Bang & Olufsen components; the purchase of seventeen properties in Philadelphia; a trip to the Super Bowl; years of 76er's season tickets from 2001 through 2005; NBA All-Star tickets; a $30,000 week-long rental of a mansion in Florida with other members of the Frankford DTA; participation in a "diamond and mink party" with other members of the Frankford DTA; and the purchase of numerous luxury items, such as multiple fur coats, a $20,000 diamond chain, a $35,000 diamond-studded Breitling watch, a $78,000 Mercedes Benz, $6,500 in jewelry from a jeweler in St. Thomas, and thousands of dollars in purchases from high-end retailers, such as Chanel, Saks Fifth Avenue, Armani Exchange, Boyds, Louis Vuitton and Nieman Marcus.

Now, rather than accepting any responsibility for his actions, Crews, through his attorney, is challenging the offense conduct laid out in the Presentence Investigation Report "in its entirety." PSR at 32, 33. The government is prepared to support the offense conduct relating to Jaquel Crews in the PSR at the sentencing hearing with citations to the sworn testimony of witnesses at the trial of Crews and Miller. The government also notes that Jaquel Crews, claiming inability to afford retained counsel, had court-appointed counsel from the time of his arrest until after his conviction, but now has found funds to retain counsel.

**2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

The seriousness of Jaquel Crews' offenses cannot be overstated, and is reflected in his adjusted offense level of 44. The court most certainly has the discretion to give a sentence outside of the advisory guideline range, but a within-guidelines sentence is the typically best way

to reflect the seriousness of Crews' offenses, to promote respect for the law, and to provide just punishment for his crimes. The government asks the Court also to keep in mind the threats against witnesses in this case, the witness intimidation that took place in the courtroom during the trial of Crews and Miller, and the steps that had to take place to keep order in the courtroom and protect those witnesses who testified against Crews and Miller.

**3. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;**

A sentence within the guidelines affords both specific and general deterrence to criminal conduct. Certainly, in this case, specific deterrence is required for a defendant who was sentenced to almost five years in prison for a drug trafficking offense and who, as soon as he is released from federal prison and while on supervised release, immediately goes back to drug trafficking and the lavish lifestyle afforded by that illegal conduct. In addition, a guidelines sentence sends a message to others who have contemplated, and would contemplate, cocaine trafficking in this district.

**4. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

There does appear to be a need in this case to adjust the sentence in order "to provide the defendant with needed educational and vocational training,." § 3553(a)(2)(D). Jaquel Crews does not yet have the equivalent of a high school diploma, and has not never held any legitimate job for any significant period of time.

**5. The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional

goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Third Circuit has explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary*." *Booker*, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. *Id*. at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *Cooper*, 437 F.3d at 331 (quoting *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original). Therefore, the Supreme Court in *Gall* held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders.

**Sentence of Co-defendant Mark Miller**

Mark Miller, Jaquel Crews' co-defendant at trial, had no criminal history points and was found to be safety-valve eligible. This Court found Miller's offense level to be 38, after a 2 level reduction for safety-valve eligibility, with a guideline range of 235-293 months. The Court credited Miller with the 33 months imprisonment served on a drug conviction that was the basis of one of the overt acts in Count Five in this case, and, therefore, sentenced Miller to an

additional 212 months imprisonment and five years supervised release.

**Sentencing Recommendation**

In the present case, the 3553(a) factors on balance support the imposition of the recommended guideline punishment.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

*K.T. Newton*

K.T. NEWTON
Assistant United States Attorney

Dated: August 12, 2013

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 10-663-4** |
| **JAQUEL CREWS,** | : | |
| **a/k/a "Quelly"** | : | |

**Summary of Cocaine Distributed by/to Jaquel Crews in Frankford DTA**

**Testimony of Donielle Fletcher** (03/01/12 N.T. 66-77)

| | |
|---|---|
| **2001** - Crews cooked 1kg cocaine into crack monthly | **12 kg cocaine** (03/01/12 N.T.) |
| **2002** - Crews cooked 1kg cocaine into crack monthly | **12 kg cocaine** (03/01/12 N.T.) |
| **2003**, Crews cooked 1-3kg cocaine into crack monthly | **20 kg cocaine** (03/01/12 N.T.) |
| **2004** - Crews cooked 1-3kg cocaine into crack every other month, then just sometimes | **10 kg cocaine** (03/01/12 N.T.) |

**Testimony of Michael Crosby** (03/06/12 N.T 110-111)

| | |
|---|---|
| **1995** - Crews supplied 1 oz cocaine 4 times | **.09 kg cocaine** (03/06/12 N.T 110-111) |
| **2003** - Crews supplied 9 oz/month for 3-4 months | **.633 kg cocaine** (03/06/12 N.T 110-111) |

**Testimony of Michael Durant** (03/02/12 N.T. 143-148)

| | |
|---|---|
| **2004** - sold 20 to 25 kg of cocaine to Jaquel Crews | **20 kg cocaine** (03/02/12 N.T. 143-148) |

**Testimony of James Miller** (03/01/12 N.T. 112-114)

| | |
|---|---|
| **2003 - 2004** - bought 4 ½ -9 oz cocaine 1 to 2 times/week from Jaquel Crews | **18.58 kg cocaine** (03/01/12 N.T. 112-114) |
| **2005** - sold 1-3 kg cocaine/ weekly to Jaquel Crews | **44 kg cocaine** (03/01/12 N.T. 117) |
| **early 2006** - sold 2 kg of cocaine to Crews, Miller | **2 kg cocaine** (03/01/12 N.T. 116) |
| **2006** - bought 2-3 kg cocaine from Crews | **2 kg cocaine** (03/01/12 N.T. 119-120) |

**Testimony of Vincent Graham** (03/05/12 N.T. 222-223)

| | |
|---|---|
| **May '05 to May '06** - got 4 ½ to 13 oz/week from Crews | **4.64 kg cocaine** (03/05/12 N.T. 222-223) |

| | |
|---|---|
| **<u>Testimony of Eric McCoy</u>** (03/02/12 N.T. 69-73) | |
| <u>mid-2006 to August '07</u> - got 4 ½-9 oz of cocaine biweekly from Jaquel Crews | **3.379 kg cocaine** (03/02/12 N.T. 69-73) |
| **<u>Testimony of Craig Lofton</u>** (03/05/12 N.T.) | |
| **2002** - Crews supplied Lofton with 9 oz cocaine/week | **9.39 kg cocaine** (03/05/12 N.T. 47-49) |
| **2003** - Lofton sold 2-3kg cocaine/week to Jaquel Crews | **88 kg cocaine** (03/05/12 N.T. 76) |
| **2004** - Lofton sold 25 kg/month to Crews | **250 kg cocaine** (03/05/12 N.T. N.T. 74-75) |
| **<u>Testimony of Emmanuel Moore</u>** (03/06/12 N.T. 25-37) | |
| **Fall '02 to early '03** - supplied Crews with 25 kg cocaine | **25 kg cocaine** (03/06/12 N.T. 25-26) |
| **May '03 - October 24, 2004** Crews, Miller and others pooled money for at least 5 kg cocaine/week | **340 kg of cocaine** (03/06/12 N.T. 25-35) |
| **October 23, 2004** Crews & Miller paid $160,000 for 10 kg cocaine (still owed $20,000) | **10 kg of cocaine** (03/06/12 N.T. 35-37) |
| **May '05 to October '06** Crews, Miller and others pooled money for 2 kg cocaine/week | **136 kg cocaine** (03/06/12 N.T. 50-52) |
| **TOTAL QUANTITY OF DRUGS INVOLVED** | **1,007.7 kg cocaine** |

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed via ECF and thus served upon the following individual:

Peter Goldberger, Esquire
Attorney for Defendant Jaquel Crews

K.T. Newton
K.T. NEWTON
Assistant United States Attorney

Date: August 12, 2013